**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **CRIMINAL NO.:  07-cr-254 (RMC)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **EUGENE P. SMITH,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| | **:** | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its counsel, the United States Attorney for

the District of Columbia, hereby submits this memorandum in aid of sentencing of defendant

Eugene P. Smith.  For over five years, from January 1997 through July 2002, Mr. Smith was an

employee of the District of Columbia Public Schools ("DCPS").  For the last three of those years,

he was the Director of Internal Audit for DCPS.  In that position, he was one of the primary

safeguards of the public funds used to pay for the education of public school children in the

District.  In 2001, while serving in that protective role, he assumed control over two bank

accounts holding public money intended to benefit public school children.  After DCPS

terminated him in July 2002, he stole over $46,000 from one of those accounts.  These days,

some might consider such a theft minor given the relatively small amount of money stolen.

Others might consider it ordinary given the constant reports of theft involving public funds.  It

would be wrong, however, to consider this theft minor or ordinary.  Instead, it should be seen for

what it is:  alarming; harmful to public service; and, ultimately, if left unchecked, a danger to our

social order.

Given his position as the Director of Internal Audit, Smith knew as well as anyone the tremendous challenges faced by DCPS to ensure that public funds went to benefit public school children. Instead of helping to overcome those challenges, however, he added to them by stealing the funds he had been charged with safeguarding. Mr. Smith's betrayal of the public school system and the reiterative betrayals of the public trust by other public servants engender despondency for the public school system and distrust in public officials generally. Given the ineffectiveness of internal controls here and in similar cases, the blunt power of the criminal justice system should be applied to help assure the public that those who abuse their public positions for private gain will be punished harshly. For these reasons, as well as those provided below, the government recommends a sentence at the high end of the advisory Guidelines range of ten to sixteen months.

**BACKGROUND**

On December 10, 2007, Smith pleaded guilty to a one-count criminal Information charging him with theft concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A). In connection with the guilty plea, Smith admitted that from January 1997 through July 2002, he was employed by DCPS. Smith also admitted that his last position with DCPS, from February 1999 through July 2002, was as the Director of Internal Audit.

According to the Statement of Offense signed by the defendant, the District of Columbia Public Schools Board of Education revoked the charter of a public charter school, the New Vistas Preparatory Public Charter School ("New Vistas"), on September 6, 2001. The next day, September 7, 2001, in his capacity as the Director of Internal Audit for DCPS, Smith became responsible for closing out New Vistas' financial accounts. Smith was responsible for taking

over the bank accounts of the public charter school, paying off the remaining vendors, and

closing out the payroll and vendor accounts.  Also on September 7, 2001, Smith designated

himself as the sole signatory on a bank account held in the name of New Vistas at Branch

Banking and Trust (the "original BB&T account").  At the time, the U.S. Department of

Education provided benefits to DCPS and DCPS, in turn, provided benefits to New Vistas.

On October 4, 2001, Smith closed the original BB&T account and transferred the balance

of the original account ($518,125.66) into a new account he opened at BB&T (the "second

BB&T account").  Smith admitted that he was the sole signatory on the second BB&T account.

He also admitted that he obtained a business check card, or debit card, for the second BB&T

account, even though any outstanding debts would have been and, in fact, were paid through

purchase orders and checks.  He admitted receiving a personal identification number ("PIN") for

the debit card, and acknowledged that he was the only person with access to that debit card and

the associated PIN.  At his direction, BB&T mailed the bank statements and the PIN for the debit

card for the second BB&T account in the name of "New Vistas Preparatory Public Charter

School, Escrow Acct," to the defendant's then-home address in Odenton, Maryland.

Smith used the same pattern of closing out New Vistas' bank account at Citibank.  That

is, New Vistas had an escrow account at Citibank.  The primary purpose of the Citibank escrow

account was to receive funds from the U.S. Department of Education.  *See* Declaration of Special

Agent Sean Ryan at ¶ 3 ("Ryan Dec.") (attached hereto as Exhibit 1).  As with the BB&T

accounts, on October 15, 2001, Smith closed out the existing Citibank account (the "original

Citibank account") and opened a second Citibank account (the "second Citibank account") in the

name of New Vistas.  *Id.*  Smith transferred the balance from the original Citibank account

($109,861.80) into the second Citibank account. *Id.* Smith used his own Social Security number

as the tax identification number to open the second Citibank account. *Id*. Smith directed

Citibank to mail the account statements to a street address in Odenton, Maryland that was one

digit off from his then-current residence in Odenton. *Id.* Unlike the BB&T account, there were

no checks or debit cards associated with the Citibank escrow accounts. *Id.*[1]

On or about July 31, 2002, the defendant's employment with DCPS was terminated due

to a reduction in force. At the time of his termination, having paid off New Vistas' vendors, the

balance in the second BB&T account was approximately $52,679.90 and the balance in the

second Citibank account remained in excess of $100,000. Smith did not close the second BB&T

account or the second Citibank account before DCPS terminated his employment. *See* Exhibit 1

(Ryan Dec.) ¶ 4. Smith also admitted that he did not relinquish the debit card or the PIN

associated with the second BB&T account.

Between his termination from DCPS in July 2002 and the end of July 2003, Smith was

unemployed. Records indicate that Smith received his final unemployment check from the D.C.

Department of Employment Services on April 22, 2003. *See* Exhibit 1 (Ryan Dec.) ¶ 5. By the

end of April 2003, therefore, Smith was unemployed, the father of two children, paying child

---

[1]     Mr. Smith was not charged with any conduct related to the Citibank accounts.
The Court, nevertheless, may consider such conduct in determining an appropriate sentence. *See*
United States Sentencing Guidelines ("USSG") § 1B1.4 ("In determining the sentence to impose
within the guideline range, or whether a departure from the guidelines is warranted, the court
may consider, without limitation, any information concerning the background, character, and
conduct of the defendant, unless otherwise prohibited by law."); *see also* 18 U.S.C. § 3661 ("No
limitation shall be placed on the information concerning the background, character, and conduct
of a person convicted of an offense which a court of the United States may receive and consider
for the purpose of imposing an appropriate sentence.").

support for a third child from a previous marriage, co-owner of a home in Odenton, Maryland, and living off the government salary of his wife. *See* PSR at ¶¶ 37-39; Exhibit 1 (Ryan Dec.) ¶ 5.

Rather than change his lifestyle to reflect his new economic reality caused by an absence of public benefits, Smith began to steal from the public funds he had once safeguarded. That is, beginning on April 11, 2003, Smith began to withdraw DCPS funds from the second BB&T account using the debit card associated with that account. Between April 11, 2003 and July 29, 2003, Smith expended $46,742.94 in cash and incurred fees for his personal benefit from the second BB&T account as a result of approximately 114 transactions using the debit card associated with that account in the State of Maryland and the Commonwealth of Virginia.[2] It appears that Smith expended the funds largely on personal expenses, such as food, gas, meals, travel expenses, a trip to the New Jersey shore and other miscellaneous expenses. *See* Exhibit 1 (Ryan Dec.) at ¶ 8. His theft ceased not because of any self-reporting on his part (or any internals controls he had instituted at DCPS while the Director of Internal Audit), but because law enforcement agents learned about the original BB&T account and the second BB&T account toward the end of July 2003 while investigating the financial operations of New Vistas prior to the revocation of its charter. *Id.* ¶ 7. On December 10, 2007, Smith pleaded guilty to one count of theft from a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A), for expending $46,742.94 in cash and incurred fees from the second BB&T account

Although Smith admitted stealing the money from the second BB&T account, he did not withdraw any money from the second Citibank account. Unlike the BB&T account statements,

---

[2]    On July 15, 2003, while unemployed, Smith and his wife signed a contract to purchase a new home in Beltsville, Maryland for $459,000; they closed on the house in August 2003. *See* Exhibit 1 (Ryan Dec.) ¶ 6.

which Smith directed BB&T to send to his home address in Odenton, Maryland, the Citibank

account statements went to a street address in Odenton, Maryland that was one digit off from

Smith's then-current address.  *See* Exhibit 1 (Ryan Dec.) at ¶ 3.  The agents determined that the

address listed on the second Citibank account statements in Odenton, Maryland was a non-

existent address.  *Id.*  Citibank, however, could not determine whether anyone received the

account statements sent to that erroneous address.  *Id.*  Nevertheless, there were no checks or

debit cards associated with the second Citibank account.  *Id.*  As a result, neither Smith nor

anyone else withdrew any funds from the second Citibank account.  *Id.*

### SENTENCING FACTORS

The Supreme Court has declared that, in terms of determining an appropriate sentence,

"[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be

the starting point and the initial benchmark."  *Gall v. United States*, ___ U.S. ___, 128 S. Ct. 586

596 (2007).  Here, the parties stipulated in the plea agreement to a Total Adjusted Offense Level

of 12, with an attendant range of 10-16 months' imprisonment, based on the following:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)) | 6 |
| Specific Offense Characteristics<br>Loss more than $30,000.00<br>(§ 2B1.1(b)(1)(D)) | 6 |
| Adjustments<br>Abuse of Position of Trust<br>(§ 3B1.3) | 2 |
| Acceptance of Responsibility<br>(§ 3E1.1(a)) | (2)[3] |

---

[3]     The Probation Office has recommended a total adjusted offense level of 15.  *See*
PSR at pp. 6-7.  The three-level differences in the total adjusted offense level between the

Further, the advisory Guidelines are the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the Guidelines, while carefully considering the factors set forth in 18 U.S.C. § 3553(a) particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. Therefore, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 128 S. Ct. at 597 n.6. As demonstrated further below, the factors set forth in 18 U.S.C. § 3553(a) support a sentence within the stipulated Guidelines range of ten to sixteen months. These factors are discussed below numbered as they are in Section 3553(a).

(1)    **The nature and circumstances of the offense and the history and characteristics of the defendant.**

(A)    **Nature and circumstances of the offense**

Here, the nature and circumstances of the offense involved the confluence of (i) theft (ii) of public monies (iii) intended to benefit children (iv) by a public servant. At bottom, Mr. Smith took what did not belong to him. On 114 different occasions, in two States, over a four-month

---

parties' stipulations and the Probation Office are (a) the Probation Office added four points to the loss figure, *see* PSR at ¶ 23, by including in the loss figure the amounts transferred into the second Citibank account ($109,000), *id.* at ¶ 16; and (b) the Probation Office decreased the adjusted offense level one-point based on the defendant's acceptance of responsibility under U.S.S.G. § 3E1.1(b). The Government's position is that the parties' stipulated Guidelines level is the appropriate level. Nevertheless, if the Court agreed with the Probation Office that the balance of the second Citibank account should be included in the loss figure (or otherwise determined that the defendant's adjusted offense level was 16 or greater), the Government would move for the additional one-point decrease based on the defendant's timely acceptance of responsibility under U.S.S.G. § 3E1.1(b).

period, the defendant illegally used the bank debit card associated with the second BB&T

account to steal $46,742.94.

The nature of this particular offense, however, was not theft from a single individual or

entity.  Instead, Smith stole from an entire community.  And he stole more than just money.  He

also stole the trust of parents, students, citizens, and former colleagues.

The offense, moreover, was directed at a particularly vulnerable part of our community –

children.  Smith, as a long-term employee of DCPS, knew that every dollar he selfishly stuffed

into his own pocket would be one less dollar available to our public school children to help them

maximize their potential.  The Supreme Court has recognized:

> [Education is not] merely some governmental 'benefit'
> indistinguishable from other forms of social welfare legislation.
> Both the importance of education in maintaining our basic
> institutions, and *the lasting impact of its deprivation on the life of
> the child*, mark the distinction.  * * *  We have recognized 'the
> public schools as a most vital civic institution for the preservation
> of a democratic system of government,' and as the primary vehicle
> for transmitting 'the values on which our society rests.' * * *  In
> addition, *education provides the basic tools by which individuals
> might lead economically productive lives to the benefit of us all*. In
> sum, education has a fundamental role in maintaining the fabric of
> our society. We cannot ignore the significant social costs borne by
> our Nation when select groups are denied the means to absorb the
> values and skills upon which our social order rests.

*Plyler v. Doe*, 457 U.S. 202, 221 (1982) (emphasis added) (citations and quotation marks

omitted).

Even worse, the nature and circumstances of this offense involved theft of public funds

by a public servant.  And not just any public servant.  But *the* public servant – the Director of

Internal Audit – who was specifically charged with safeguarding the public monies intended to

benefit our public school children.  The public has a general right to expect that "taxpayer dollars * * * are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off."  *Sabri v. United States*, 541 U.S. 600, 605 (2004).  More specifically, the public has a right to expect that those public servants charged with protecting the welfare of public school children will put the children's interests above their own selfish, material wants.

Mr. Smith's crime falls squarely within the class of cases to which the applicable Guidelines are addressed.  Thus, consideration of the nature and circumstances of the offense counsel in favor of a within-Guidelines sentence.  Because the nature and circumstances of this offense also reflect the type of betrayal of the public's trust that causes distrust in our public office holders and despondency for our public school system, this factor suggests that a sentence at the high end of the advisory Guidelines range is appropriate.

### (B)  The history and characteristics of the defendant

The defendant's history and characteristics also counsel in favor of a within-Guidelines sentence.  Here, the PSR reflected that Mr. Smith was professionally, intellectually and emotionally capable of avoiding his criminal conduct, but instead chose to engage in it intentionally and repeatedly.  The PSR reflected that the defendant had a relatively stable upbringing, *see* PSR at ¶¶ 34-40, held a Bachelors degree in Business Administration, *id.* at ¶ 48, and had no history of physical, mental or emotional health issues, *id.* ¶¶ 44.  According to the PSR, through July 2007, the defendant generally held financially secure and upwardly mobile professional positions in the District of Columbia, Detroit, Baltimore and Lancaster, Texas.  *Id.* ¶¶ 53-57.  The defendant, in short, was someone who knew better than to use the debit card

associated with the second BB&T account 114 times in two States over a four-month period to

steal $46,742.94.  Based on his education and emotional well-being, he was also capable of either

exercising some minimal self-restraint to forgo the money or, if required to support a desired

lifestyle, of trying to earn it through hard work.  A review of the defendant's character should

also reflect that he falsely denied stealing the money when he was initially approached by law

enforcement agents in September 2004.  *See* Exhibit 1 (Ryan Dec.) ¶ 7.

The defendant nevertheless subsequently accepted responsibility for his crime pre-

indictment.  He has no prior criminal record.  As part of his plea agreement, the defendant

pledged to repay the money he stole from DCPS and has taken appropriate steps to ensure that

the funds remaining in the second BB&T account and the second Citibank account were returned

to the District of Columbia/DCPS.

> **(2)    The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the pubic from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training.**

A within-Guidelines sentence is appropriate "to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense."  *See* 18 U.S.C. §

3553(a)(2).  Here, as discussed above, in betraying the public trust our community had placed in

him, Smith committed a serious felony offense.  Such a serious offense requires an equally

serious punishment.

In addition, deterrence of others and promoting respect for the law are particularly

important objectives in this case.  There are huge numbers of government employees in this

community and throughout this country who have the honor and duty of serving the public.  Our

governmental agencies depend upon honest public servants to advance their operational, social, cultural and charitable missions.  Such agencies generally also depend upon honest government employees, such as the defendant, to manage their financial affairs and safeguard the community's tax dollars.  The negative effects of a corrupt government employee are not confined to the employee's specific agency; instead, such public corruption tends to cast skepticism and, worse, cynicism broadly against government agencies, leading to a decrease in the morale and the effectiveness of such agencies.  The defendant's sentence, therefore, should serve both to vindicate the conduct of honest government employees and to warn others considering a corrupt path that the criminal law will deal harshly with those seeking to profit illegally from their public positions.

The need for deterrence of others and to promote respect for the law are also important objectives in this case because of the historically large amounts of public funds being expended in the District of Columbia, particularly in the area of public education.  In Fiscal Year 2008, the District of Columbia expected to spend approximately $9.8 billion.  *See* FY 2008 Proposed Budget and Financial Plan of the District of Columbia (dated June 7, 2007) at p. 32.[4]  Of that total amount, the District planned to spend over $1.55 billion to operate the District's public education system, including the District of Columbia Public Schools and the District of Columbia Public Charter Schools.  *Id.* at p. 35.[5]

---

[4]    Page references are to the PDF version of the proposed budget available at the following: http://cfo.dc.gov/cfo/frames.asp?doc=/cfo/lib/cfo/budget/2008/Volume_1_web.pdf.

[5]    DCPS expends more local funds than any other District agency, and it employs approximately one-third of all District employees.  *Id.* at 127.

Separately, as part of the Public Education Reform Amendment Act of 2007, D.C. Law 17-9, effective June 12, 2007, the Mayor established the Office of Public Education Facilities Modernization, which is independent of DCPS.  The Office of Public Education Facilities Modernization is responsible for managing the modernization and new construction of DCPS and District of Columbia Public Charter Schools facilities.  The Office of Public Education Facilities Modernization reportedly planned to spend $120 million to maintain and improve the public schools, and it recently announced plans to spend another $110 million this Spring to prepare the schools for next year.  *See* Dana Levitz, *Washington to Spend $110 million Repairing, Closing Public School Buildings*, The Examiner (Feb. 29, 2008).[6]

As would be expected, and as validated by several recent cases of public corruption, such phenomenal sums of public money on the local level in the District of Columbia bring with them the temptations to steal and to corrupt public officials.  The criminal justice system can play a valuable role in helping to dampen those temptations.  Here, in particular, this Court has an opportunity to demonstrate to the public at large that there are harsh consequences for those public officials who steal, including those who hold such high positions of public trust and steal less than $50,000.  Mr. Smith, therefore, must be punished harshly both for his own betrayal of the public trust and to deter others from following his corrupt path.  This factor suggests that a sentence at the high end of the advisory Guidelines range of 10-16 months' imprisonment is appropriate.

---

[6]    Available at http://www.examiner.com/a-1249704~Washington_to_spend_110_million_repairing_closing_school_buildings.html.

As to the final consideration, there does not appear to be a need in this case to adjust the

sentence "to provide the defendant with needed educational or vocational training, medical care,

or other correctional treatment in the most effective manner." *See* 18 U.S.C. § 3553(a)(2)(D).

**(3)      The kinds of sentences available**

The maximum term of imprisonment for this crime is 10 years, with a term of supervised

release of not more than 3 years.

**(4)      The sentencing range established by the United States Sentencing Guidelines**

Here, the government and the defendant stipulated in the plea agreement to a Total

Adjusted Offense Level of 12, with an attendant range of 10-16 months' imprisonment.  In the

plea agreement, the parties stipulated that the applicable fine range was a fine of up to $250,000

or a fine of twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d), but that the

applicable fine range at the Stipulated Guidelines level 12 was $3000.00 to $30,000.00.  The

Probation Office also calculated the maximum fine as $250,000.  *See* PSR at 13, ¶ 77.  The

government makes no recommendation on whether a fine is appropriate in this case.  The PSR

determined that it does not appear that the defendant is able to pay a fine.  *Id.* ¶ 64.

The government bases its recommendation for a within-Guidelines sentence of ten to

sixteen months, in part, on the fact that such a sentence properly reflects the accumulated wisdom

and expertise of the Sentencing Commission, and serves the vital goal of uniformity and fairness

in sentencing.  While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly

mandatory, now serve as one factor among several courts must consider in determining an

appropriate sentence," *Kimbrough v. United States*, ___ U.S. ___, 128 S. Ct. 558, 564 (2007), it

remains the case that "the Commission fills an important institutional role:  It has the capacity

courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Id.,* 128 S. Ct. at 574 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). As stated by the Supreme Court in *Kimbrough*: "We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 128 S. Ct. at 574 (quoting *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007)).

In *Rita*, the Supreme Court held that an appellate court may presume that a within-Guidelines sentence is reasonable. While this presumption does not apply before the district court, *Rita*, 127 S. Ct. at 2465, the Supreme Court's observation is informative that "the presumption reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing Court and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case. That double determination significantly increases the likelihood that the sentence is a reasonable one." *Id.* at 2463 (emphasis in original).

(5)     **Any pertinent policy statement issued by the United States Sentencing Commission**

The government is unaware of any pertinent policy statements issued by the United States Sentencing Commission.

(6)     **The need to avoid unwarranted sentencing disparities among defendants with similar records**

As discussed above, a within-Guidelines sentence would help prevent such disparities between the defendant and similar defendants.

**(7)    The need to provide restitution**

As part of his plea agreement, the defendant agreed to pay restitution in the amount of

$46,742.94 to the Treasurer of the District of Columbia.  Mr. Smith also agreed to assist the

Government in returning to the District of Columbia any funds remaining in the second Citibank

account.  To that end, the defendant fulfilled his obligation by writing a letter to the State of

Maryland requesting that the State transfer any funds from that account to DCPS.[7]

**CONCLUSION**

For the foregoing reasons, the government respectfully recommends a sentence at the

high end of the advisory Guidelines range of 10-16 months' incarceration, a two-year period of

supervised release, and restitution in the amount of $46,742.94 payable to DCPS.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
In and For the District of Columbia


By:    _____/s/_____
MICHAEL K. ATKINSON
D.C. Bar # 430517
Assistant United States Attorney
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530
(202) 616-3702
Dated: April 30, 2008                    Michael.Atkinson2@usdoj.gov

---

[7]    Because of the inactivity in the second Citibank account, those funds were forfeited to the State of Maryland.  The letter written by the defendant to the State helped to secure the return of the remaining balance to the District of Columbia/DCPS.  The defendant also wrote a letter to BB&T that was instrumental in BB&T returning the remaining funds in the second BB&T account to the District of Columbia/DCPS.

# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO.:  07-cr-254 (RMC)** |
| | : | |
| **v.** | : | |
| | : | |
| **EUGENE P. SMITH,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

**DECLARATION OF SPECIAL AGENT SEAN RYAN IN
SUPPORT OF THE GOVERNMENT'S SENTENCING MEMORANDUM**

Special Agent Sean Ryan of the Federal Bureau of Investigation declares as follows:

**A.      Background**

1.      From February 2004 to the present, I have been employed as a Special Agent with

the Federal Bureau of Investigation (FBI).  Prior to the FBI, I worked in the banking industry for

over eight years.  While a Special Agent with the FBI, I have received from the FBI specialized

training that has provided me with a background and basis of knowledge relating to the

investigation of fraud and public corruption, including but not limited to, federal program fraud,

in violation of Title 18, United States Code, Section 666(a)(1)(A).

2.      I have been the co-lead case agent assigned to the investigation and prosecution of

the defendant, Eugene P. Smith, since November 2006.

**B.      Investigation of Smith's Involvement with the Citibank accounts**

3.      As part of the investigation, it was determined that Smith took over accounts held

in the name of New Vistas Public Preparatory Charter School ("New Vistas") at both Branch

Banking and Trust ("BB&T") and Citibank.  With regard to the New Vistas account at Citibank,

Smith took over that account in his capacity as the Director of Internal Audit for the District of

Columbia Public Schools ("DCPS"). The primary purpose of the Citibank escrow account was to receive funds from the U.S. Department of Education. On October 15, 2001, Smith closed out the existing Citibank account (the "original Citibank account") and opened a second Citibank account (the "second Citibank account") in the name of New Vistas. Smith transferred the balance from the original Citibank account ($109,861.80) into the second Citibank account. The tax identification number used by Smith to open the second Citibank account was Smith's Social Security Number. Citibank mailed the account statements to an address in Odenton, Maryland that was one digit off from Smith's then-current home address in Odenton. Our investigation was unable to determine the reason for the discrepancy in the address listed on the account statements. Our investigation revealed that the erroneous address listed by Citibank on the account statements for the second Citibank account was a non-existent address. Citibank, however, could not determine whether anyone received the account statements for the second Citibank account that were addressed to the erroneous street address in Odenton, Maryland. Nevertheless, there were no checks or debit cards associated with the second Citibank account. As a result, neither Smith nor anyone else withdrew any funds from the second Citibank account.

        4.      On or about July 31, 2002, the defendant's employment with DCPS was terminated due to a reduction in force. At the time of his termination, having paid off New Vistas' vendors, the balance in the second Citibank account remained in excess of $100,000. Smith did not close the second Citibank account before DCPS terminated his employment.

C.       **Smith's Post-DCPS Conduct**

5.       Between his termination from DCPS in July 2002 and the end of July 2003, Smith was unemployed. Records obtained from the D.C. Department of Employment Services stated that Smith received his final unemployment check from Employment Services on April 22, 2003. By the end of April 2003, therefore, Smith was unemployed, co-owner of a home in Odenton, Maryland, and living off of the government salary of his wife.

6.       On July 15, 2003, while unemployed, Smith and his wife signed a contract to purchase a new home in Beltsville, Maryland for $459,000. They closed on the house in August 2003.

7.       Toward the end of July 2003, law enforcement agents investigating the financial operations of New Vistas prior to the revocation of its charter in September 2001 learned about the original BB&T account and the second BB&T account, including the use of the bank debit card associated with the second BB&T account. The second BB&T account was frozen by BB&T at the request of law enforcement agents on August 5, 2003.

8.       The investigation attempted to determine how Smith expended the funds that he illegally obtained from the second BB&T account. Given the cash nature of many of the transactions, law enforcement agents were unable to determine the specific manner in which Smith expended the funds. Nevertheless, based on Smith's personal credit card bills, bank statements, and money order purchases, it appears that Smith expended the funds largely on personal expenses, such as food, gas, meals, travel expenses, a trip to the New Jersey shore and other miscellaneous expenses.

9.       On September 7, 2004, Smith was approached at his then-place of employment in Baltimore, Maryland by law enforcement agents from the Federal Bureau of Investigation and the

District of Columbia Office of Inspector General. After being advised of the agents' identity and

the nature of the investigation, the defendant agreed to a consensual interview. During the course

of the interview, Smith denied knowing what happened to the debit card associated with the

second BB&T account and the remainder of the money in New Vistas' bank account following

his termination from DCPS. During that interview, Smith also stated that he had no idea why

there would have been ATM withdrawals from the New Vistas account in 2003 or why such

withdrawals were made from ATM machines and other locations in the vicinity of his then-

current residence.


        I declare that the above is true and correct to the best of my information and belief.


_____                    _____/s/_____

DATE                                  SEAN RYAN

                                          Special Agent

                                          Federal Bureau of Investigation