UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 07-CR-254 (RMC) |
| EUGENE P. SMITH | : | |

### MEMORANDUM IN AID OF SENTENCING

On December 10, 2007, Mr. Eugene P. Smith entered a plea of guilty before this Honorable Court to one count of theft from a program receiving federal funds, in violation of 18 U.S.C. § 666. He will appear before the Court for sentencing on May 14, 2008. For the following reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Smith respectfully requests that the Court impose a sentence that does not include a period of incarceration.

### Factual Background

Mr. Smith is a 47 year old man who worked most of his life to support his family and serve others, then lost his job due to a District of Columbia Public School's reduction in work force, and made a life-altering mistake. A review of his history – before and after – the commission of the instant offense, demonstrates that this offense was an aberration.

Mr. Smith grew up in Berlin, Maryland. He was raised by his mother and father, along with one brother and five sisters. His mother was a domestic worker and his father was a factory worker. His family struggled financially, and when he was ten years old, he started working, washing dishes in a local restaurant to help pay for his school clothes and supplies. He continued to work as he grew up and in high school was able to buy himself a used car.

After graduating from high school, he began college, first at Morgan State University, then transferring to Towson State University, and then transferring back to Morgan State University. When he was in college, Mr. Smith learned that his father was not his biological father, but was his step father. He also learned that his biological father was related to his mother and that this man had died when Mr. Smith was in middle school. Mr. Smith was distraught when he learned this, but struggled to stay in school and earned a Bachelor of Science in Business Administration from Morgan State in 1983. After graduating, he began working in a management training program with the Army AirForce Exchange Service, the company that manages military commissaries.

In 1985, Mr. Smith moved back to the D.C. area and married his high school sweetheart. Their son, Marquis, was born in 1991. A short time later, the couple separated, and they divorced in 1996. Mr. Smith pays $855.00 per month in child support and continues to have a good relationship with his son.

After moving back to the D.C. area, Mr. Smith first took a job managing a McDonald's restaurant and then joined the McDonald's regional accounting office. Over the next ten years, he changed jobs several times, always looking to move to a better position. He worked for Hechingers as an accounting supervisor, then for Dimensions Health Corporation as an accounting supervisor, and then for Prince George's County Schools as an accounting supervisor and internal auditor.

In 1997, Mr. Smith remarried. He and his wife have two daughters, 9-year-old Simone and 7-year-old Alyse.

The same year he re-married, Mr. Smith obtained a job with the District of Columbia Public School ("DCPS"). During the year five years he worked at DCPS, he held various positions, including Special Assistant to the Chief Financial Officer, Controller, Deputy Chief Financial Officer, and Director of Internal Audit. In late 2001, he was asked to close out the financial accounts for New Vistas Preparatory Public Charter School, a school whose charter had been revoked by the DCPS Board of Education. Nine months later, in July 2002, he lost his job as the result of a reduction in work force.

He was forty-two years old and for the first time since he was ten years old, he found himself unemployed. During the following months, Mr. Smith was at the lowest and most difficult point in his life. From July 2002 to April 2003, he and his wife struggled to support themselves and their two daughters (and pay child support for Mr. Smith's Son) on his wife's salary and his unemployment checks. In April 2003, just before his last unemployment check arrived, the instant offense began. Mr. Smith knew that he had not done the final close out of the New Vistas school accounts before leaving his job at DCPS and began searching the files he took with him when he left. In the files, he found the ATM/debit card that belonged to one of the New Vista bank accounts, and he began using the card to withdraw small amounts of money from ATM machines and to pay for food, gas and other purchases. The last date that he used the card was July 29, 2003.[1]

Finally, after searching for a year, at the beginning of August 2003, Mr. Smith was offered a job as the Executive Director of the Accounting Office for the Detroit Public Schools.

---

[1] As the government notes, the bank account was frozen one week later, on August 5, 2003. See Declaration of SA Sean Ryan at ¶ 7.

He worked in Detroit for a year and then returned to Maryland to take a job as a Controller for the Baltimore City Public Schools. In April 2005, he resigned from that job to take a job as the Chief Financial Officer for Lancaster Independent School District in Lancaster, Texas. He worked there for almost two years and then, in March 2007, took a job as a software consultant for Everge Group in Plato, Texas. He was laid off from that job after only four months, due to a lack of business, and remained unemployed for more than six months.

Mr. Smith was not questioned about his improper use of the ATM/debit card until September 2004. When first questioned, he was scared and denied use of the card. However, he subsequently accepted responsibility and agreed to enter a pre-indictment guilty plea.

Recently, Mr. Smith moved back to the D.C. area, after obtaining a position with Holy Comforter-St. Cyprian Community Action Group. See Letter from Harold J. Gordon (submitted under separate cover). He currently is earning $3,200 a month, working as a consultant. Since he began working, he has started saving money to begin repaying the money he took from the New Vistas account and hopes to bring an initial restitution payment to the sentencing hearing. He is committed to repaying his debt to DCPS.

## **Argument**

When imposing a sentence, the Court must consider:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentenced imposed –

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

      (C) to protect the public from further crimes of the defendant; and

      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

   (3) the kinds of sentences available;

   (4) the kinds of sentence and the sentencing range established for [the applicable offense and the applicable category of defendant as set forth in the Sentencing Guidelines];

   (5) any pertinent policy statement [issued by the Sentencing Commission];

   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

   (7) the need to provide restitution to any victims of the offense.

See 18 U.S.C. § 3553(a); United States v. Booker, 543 U.S. 220, 259 (2005).

    Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

See 18 U.S.C. § 3582 (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

**(1)    The United States Sentencing Guidelines.**

As set forth in the Presentence Investigation Report ("PSR"), the recommended sentencing range under the Guidelines is 10 to 16 months, with at least half of the bottom of the range (5 months) being served in prison and any remaining portion may be served in home detention or community confinement. PSR at ¶¶ 66, 66a. However, when sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable." Gall v. United States, 128 S.Ct. 586, 596-597 (2007). Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. Kimbrough v. United States, 128 S.Ct. 558, 564 (2007). Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors sets forth in § 3553(a). Gall, 128 S.Ct. at 597. Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] … sentences that might achieve § 3553(a)'s objectives," Booker and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." Rita v. United States, 127 S.Ct. 2456, 2463, 2465, 2469 (2007); see also Gall, 128 S.Ct. at 598 ("[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue" (quoting Koon v. United States, 518 U.S. 81, 113 (1996))). When the Guidelines' "rough approximation" conflicts with the Court's view of the sentence warranted by other § 3553(a) factors, the Court may disregard the

sentencing range recommended by the Guidelines in favor of one that is tailored to the circumstances of the defendant. Rita v. United States, 127 S.Ct. at 2463–2464 ("[t]he sentencing courts, applying the Guidelines in individual cases may depart (either pursuant to the Guidelines or, since Booker, by imposing a non-Guidelines sentence)").

Here, the remaining § 3553 factors demonstrate that a sentence slightly below the recommended range would be appropriate. The bottom of the recommended range is a sentence of 5 months incarceration and 5 months in home detention or community confinement, as a condition of supervised release. For the reasons set forth below, deviating slightly from that range to impose a sentence that does not include the 5 months incarceration, but substitutes home detention, would be appropriate.

**(2)    The Nature and Circumstances of the Offense.**

The offense occurred five years ago and involved the theft of $ 46,742.94. Mr. Smith recognizes that this was a serious offense and makes no excuses for his conduct. He fully accepts responsibility for this offense. He recognizes that the money he stole should have been returned to the District of Columbia Public Schools and that stealing any amount of money from any entity is a serious offense.

The government's depiction of the offense, however, must be clarified slightly. See Government's Memorandum In Aid of Sentencing ("Government's Memorandum"). The theft at issue here occurred from April 2003 to July 2003.[2]    The Government's

---

[2]The Presentence Investigation Report ("PSR") incorrectly states: "The criminal conduct charged in the Information occurred from October 2001 through July 2003." PSR at ¶ 2. Mr. Smith objected to that language, noting that the theft occurred between April and July 2003. The Probation Office responded, noting that the theft did occur from April 2003 to July 2003, but leaving the report unchanged because: "The dates listed in paragraph 2 were taken directly from

Memorandum suggests that Mr. Smith planned the theft long before that, by inferring that when, in late 2001, he closed two New Vista bank accounts and reopened the accounts, he did so for the purpose of later stealing the money. That is not true. As the government notes, Mr. Smith's job required that he "take over the bank accounts" of the charter school. Government's Memorandum at 3. Mr. Smith closed and re-opened those bank accounts because after the school's charter was revoked and before Mr. Smith began the close out process, unauthorized checks were issued and cashed on one of those accounts. Mr. Smith, in his capacity as the individual responsible for closing out the school accounts, filed a claim with the BB&T bank, seeking the return (to DCPS) of the funds that were withdrawn without authorization. He then, at the request of BB&T personnel, with the knowledge and consent of his superiors, and on the advice of the District of Columbia Inspector General's Office, closed and re-opened those accounts because of concern that there may be additional checks that had been issued improperly and without authorization. Mr. Smith was not planning ahead to steal money. Mr. Smith had no idea at that point that he was about to lose his job, nor could he foresee the desperation he would feel a year and a half later (the desperation that actually led to the commission of the instant offense). When he reopened the accounts he was asked to provide his driver's license information and his address. BB&T issued an ATM/debit card with the account he opened there, because that is what BB&T does when an account is opened. Mr. Smith completed all of the forms that were provided to him to open the

---

the Information filed by the Government in this case." PSR at p.16. The Information refers to events that occurred in October 2001, but does not refer to any *criminal conduct* that occurred prior to April 2003. The report, therefore, should be corrected.

new accounts. BB&T gave him the form for the ATM/debit card, and he completed that form along with the others. Mr. Smith did not specifically request the card for any illegal purpose. He merely completed the forms he was given. Notably, no such card was issued for the Citibank account that he closed and reopened in the same time frame and for the same reasons.

In its memorandum, the government also discusses at great length, the Citibank account that was not closed before Mr. Smith was terminated from DCPS, suggesting that he intended to steal from that account. There simply is no evidence to support that suggestion. There was no ATM/debit card issued for that account. There were no unauthorized checks drawn on that account. There was no effort ever by Mr. Smith (or anyone else) to access that account. In fact, the account was dormant for so long (at least three years) that the funds in the account were forfeited to the State of Maryland. At worst, Mr. Smith's actions in relation to the Citibank account demonstrate that Mr. Smith failed to complete his job before his job was eliminated – irresponsible, maybe, but certainly not criminal and certainly not something for the Court to consider in determining an appropriate sentence.[3]

Finally, the government paints this case as the beacon of public official abuse of trust cases. It clearly is not. Mr. Smith does not dispute that he abused the trust he was

---

[3]The government's memorandum mistakenly states that the PSR includes the amount of money in the Citibank account in the guidelines calculation. Government Memorandum at 6-7 n.3. The final report does not do so. The initial disclosure report had an erroneous calculation that the Probation Office changed upon the objection of Mr. Smith. The Court should not be appraised of erroneous information contained in initial disclosure PSRs – particularly here where the errors in the initial disclosure were inconsistent with the plea agreement.

given by failing to ensure that all of the New Vista funds were returned to DCPS before he left DCPS's employ and by continuing to possess the ATM card for the BB&T account. However, he did not plan to steal money from DCPS while employed there. While he was working for DCPS, he was a good employee who performed his job well. He stole nothing from DCPS while working there and left on good terms due only to a reduction in work force. It was not until nine months after he lost his job with DCPS that he first used the ATM card for his own personal use. The facts of this case simply do not support the government's request that the Court make an example of Mr. Smith.

**(3)     The History and Characteristics of the Defendant.**

Apart from this case, Mr. Smith has no criminal record of any kind. This offense occurred after Mr. Smith had been unemployed for almost a year and was distraught. As the letters submitted to the Court under separate cover demonstrate, this conduct was completely out of character for Mr. Smith. In the more than five years since the offense occurred, he has worked hard to find new employment. During this time, he has again demonstrated that he can be a productive, law abiding citizen. His conduct before and after the offense charged here supports a finding that this offense was an aberration.

**(4)     The Purposes of Sentencing.**

A sentence that does not involve a period of incarceration would be sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct. Mr. Smith's prosecution for this offense has had a significant effect of him and his family. This prosecution has been well publicized. See Ex-Official Is Charged with

Stealing $46,000, Washington Post (Oct. 3, 2007).  As a result, his actions are well known to his family and friends.  He now will have to live with the stigma he has brought upon himself.  See Letters (submitted under separate cover).

In addition to the damage he has done to his personal reputation, as a result of his conduct, he now has a felony conviction.  This conviction will have significant consequences on his future -- most significantly, it will limit his employment opportunities.

No period of incarceration is necessary to protect the public from further crimes of Mr. Smith -- there will be no further crimes.  The effect that this case has had on his life – absent any period of incarceration – is sufficient to guarantee that he will never commit another offense.  Moreover, as the United States Sentencing Commission has recognized, defendants without any prior contact with the criminal justice system are unlikely to recidivate.  See United States Sentencing Commission, Recidivism and the "First Offender", A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004) (offenders with no prior arrests or convictions have the lowest recidivism rate).

Nor is a sentence of incarceration necessary to deter others.  Mr. Smith has and will continue to be punished for his conduct.  To the extent that would-be thieves are deterred by the sentences of others, Mr. Smith's public humiliation and damaged reputation, along with the negative effects on his family and his ability to obtain comparable employment, would sufficiently deter any similarly situated individuals.

Finally, no period of incarceration is necessary "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." See 18 U.S.C. § 3553(a). Mr. Smith has worked hard to secure employment while this case has been pending and is now working again. A sentence that includes a period of incarceration would only hinder his employment efforts.

**(5)     The Kinds of Sentences Available.**

Here, rather than imposing a period of incarceration, the Court can impose a period of probation or supervised release with significant conditions, such as home confinement with electronic monitoring. A sentence of supervised release (or probation) itself is a "'substantial restriction of freedom.'" Gall, 128 S.Ct. at 595 (citation omitted). As the Supreme Court has explained:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See United States v. Knights, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

Id. at 595-96 (footnote omitted).

Here, an alternative to incarceration is an appropriate form of punishment in light of Mr. Smith's background and characteristics. This is his only criminal conviction and, since this offense occurred (almost five years ago), he has demonstrated that he deserves a second chance. As the United States Attorney himself has noted, "'everybody deserves a second chance.'" Washington Post (May 8, 2007) (quoting United States Attorney Jeffrey Taylor). Moreover, as noted above, Mr. Smith and his family have suffered as a result of Mr. Smith's conduct. As the President of the United States, George Bush, has declared, a probationary sentence is indeed a harsh sentence where (1) the defendant is a first time offender; (2) the defendant has lost his job; (3) the reputation the defendant gained through years of professional work is forever damaged; (4) the defendant's wife and young children have suffered immensely; and (5) the consequences of the felony conviction on the defendant's former life will be long-lasting. See http://www.whitehouse.gov/news/releases/2007/07/20070702-3.html, Statement of President George W. Bush, accompanying Proclamation 8159, Grant of Executive Clemency, 72 FR 37095 (July 2, 2007).

**(6)    The Need to Avoid Unwarranted Sentence Disparities.**

The government argues that Mr. Smith should receive a sentence within the guidelines range because: "Reference to the Guidelines, while carefully considering the factors set forth in 18 U.S.C. § 3553(a) particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments." Government Memorandum at 7. Regardless

13

of the judicial assignment, however, a consideration of the § 3553 factors demonstrates that in this case a sentence below the range is appropriate. Not all disparities in sentencing are prohibited – only *unwarranted* disparities. See 18 U.S.C. § 3553(a)(6). That in other similar cases the § 3553 factors may not support a sentence below the range does not support a within range sentence here. No unwarranted disparity would result from a sentence below the applicable range here, because the § 3553 factors support such a sentence.

**(7)    The Need to Provide Restitution to Any Victims of the Offense.**

As noted in the PSR, Mr. Smith has agreed to pay restitution. He expects to begin doing so on the day of his sentencing. In addition, at the request of the government, he sent letters to assist DCPS in recovering all of the funds remaining in the New Vistas accounts. Mr. Smith is committed to making DCPS whole as soon as possible, and permitting him to remain in the community would allow him to do so.

## Conclusion

For all of the foregoing reasons and such other reasons as may be presented at the sentencing hearing, the Court should impose a sentence that does not include a period of incarceration. Such a sentence would be reasonable and appropriate.

>Respectfully submitted,
>
>A.J. KRAMER
>FEDERAL PUBLIC DEFENDER
>
>    /s/
>
>_____
>MARY MANNING PETRAS
>Assistant Federal Public Defender
>625 Indiana Avenue, N.W.
>Suite 550
>Washington, D.C. 20004
>(202) 208-7500 ext. 109